Good afternoon, Your Honors. May it please the Court, my name is Howard Davis. I represent the petitioner, Mr. Anura, and I'd like to reserve about two minutes for my rebuttal. Unless the Court has any specific concerns or questions about the credibility issue, I'd like to begin focusing on the issue of persecution. Although, in looking over at the judge's decision, and I know I did not raise this, but, and I did focus on, I did think that the judge did give half of a positive credit. I think that what would concern me about the judge's characterization of the well-founded fear was that all he really has to fear is the fact that he's not going to get away with it. His fear, ultimately, is that he's not going to be able to put on another play. But what, and this is why I think that this case, at least in discussing persecution, at the very least, the well-founded fear issue that it fits within limb is that one of the things that the judge didn't do was to do a, the cumulative analysis. Yes, the play was censored, but then afterwards, he began to receive threats in connection to the play. I recall the threats were if you put on the play, we'll kill you, and he didn't put on a play. Right, no, but what happened afterwards is that then the whole thing became very public, and the subsequent threats had to do with that. At the same time, something not mentioned in the judge's decision is that before he left, not only had he received another telephone, a telephone threat in October of 98, which did specifically mention, you know, all the publicity that had come out about the censorship of the play, but also other members of the theater group connected to the production of the play had also received threats. And then after he leaves, the threats don't stop. His wife receives a couple of threats, and the last set of threats cause her ultimately to abandon the family home. At the same time, he also mentioned, and again, this is something the judge didn't mention. He only referred to someone who was in one of his plays or movies from 1988, but I never really saw that in the record, and maybe I just missed that. But he did also mention that there were people connected with his plays and movies who, after he left the United States, he heard had been arrested and harmed. And so I think that certainly, you know, at the very least, that, I mean, the threats don't stop. They escalate. It causes him to leave, and it causes his family to go into hiding. Let me ask you a question. Let me go back to the credibility issue, because the I.J. was not convinced that Mr. Enora was assaulted at knife point, and he based that, the I.J. based that on the fact that he, Mr. Enora, had made no mention of the assault in his application for asylum, and the police complaint filed by his wife made no mention of, it mentioned an assault, but not at knife point. And that's in the record at 367, Mr. Enora's wife says, a group of thugs surrounded me at Grand Pass Junction, and after threatening me, said I will be killed and hidden if the drama Del Gigio was shown on August 30th. So she doesn't mention the knife attack. Isn't that substantial evidence to support the I.J.'s decision? Well, no. And one reason is that the judge backtracks. At first he, and this is one of the interesting things about his decision, is that he kind of goes back and forth. And then if we turn to, if we turn to, of course, there are a couple of copies of the judge's decision in the record, but let us go to 32 of the administrative record. At the very least, at this point, it says, referring to the August 28th incident and his opinion that he didn't think that it alone arose to past persecution, he says, the Court is significantly doubtful that a knife was ever pulled, though it's possible he was threatened. That is consistent with his testimony, though none supported by his wife. I think that's possible. So it seems that at that point, the way I read it is, is that he's decided that the man was assaulted. Now, with regard to why not, why? I thought he was saying, I don't believe he, I believe he may have been threatened, but I don't believe he was threatened with a knife. At that point. And I believe that he was personally threatened by means of an assault. And if you were to take the knife out, well, the way that he, the way that he told it was, is that, you know, he was basically shoved down against the wall or something and with four people there. And so then at this moment, you have that assault, which I think can be classified, characterized as an assault, but without the knife. Now, why specifically not back a retract on the knife, it's not clear. But I would also say that. It's been a long time since first year torts. I think you even have a little trouble with the assault where the threat is conditional and the condition is not fulfilled, don't you? But certainly if, I mean, an assault can be, I mean, is a threat. I mean, you could also call it a battery as well. I mean, it was referred to as an assault. I mean, there was definitely an unwanted touching there. But the thing, but I think. But I don't think. It's not enough for persecution. No, but there was a, but with regard to the I-589, now, he did talk about, you know, what happened that night, a threat. Now, I don't think that it's specifically inconsistent because, I mean, when talking about what's a, or a contradiction, and that's discussed in the brief about what's a contradiction, it's, it is something that's specifically, you're saying one thing and then it's something that's specifically saying that it is not. I would say that it is a, this is a general statement that, I mean, and a threat can take place in, in, in many different forms. And if upon further discussion it's, it's a combination of words and, and consensitude touching and. Is there ever a threat, if you come back here, we're going to kill you, as opposed to if you put on the play, we're going to kill you? I don't, in terms of, well, it's, but it wasn't limited to the play. I don't recall there seeing that if you come back here, we'll kill you. But, but the thing is, is that he's already been, he's already in, perceived to be an opponent. And he said that's the issue. Oh, sure he's an opponent. They say if you put on, sure he's an opponent. No, but. He's soft on the Tamil Tigers. By the way. And they say if you put on the play, we'll kill you. No. And he says, okay, I'm not putting on the play. But it wasn't, but it didn't stop at that. I mean, if that, if that was all that it was, then it would be different. But there can, the threats continue, and specifically referring to, now it's, now it's a big cause for labor, a big controversy. So it doesn't end there. He's perceived to be the opponent that, you know, that he, that he is. And it gets down to, in a certain sense, an impute. And the judge had no problem that there was a political opinion issue involved. And at the very least, there is a continuing imputation of, of, of a, of an opposing opinion. What, what is the evidence in the record that any of these artists who, who had been allegedly persecuted in Sri Lanka had any connection with the petitioner? Okay, now. All right. Let me. Let's see. Well, first, I think it's around 136 or 137 of the record. Well, okay. So in 136, right, bottom of 135 to 136, it does mention people connected with his play, when he, the actors and actresses, when he told them about the threat, what happened to him, they also said some of the actors, this is Papa 136, line one, some of the actors and actresses had also received threats, they told me, et cetera. So it, it, it goes down from the next several lines, it talks about that. With regard to those. I read about, I read this, I read this part of the transcript and I was thinking, gee, you could get this in San Francisco if you put on a pro-George Bush play. It's just the hostility that you would expect. Hold on, let me get to my point. This is just the hostility you could expect if you do something in public that's contrary to majority opinion in the community, except for the knife. The knife is getting serious. If there are serious threats to kill, that's so that he has a well-founded fear of being killed on account of his political opinion, and it's believable, then he's in. But he's got stuff like somebody calls and uses bad language to his wife, well, that's unfortunate, but that's not persecution. And it doesn't give rise to a well-founded fear of persecution. But he also received, but there were also, there were also threats of death after the, and this is definitely in the October of 1998 one, that he mentioned that there was. Let's see, which lines are you referring to here? Okay. Let's see. I mean, I'm reading stuff like we told you not to do anything about it. Why are you so concerned about the minorities? People expressing their disapproval of his views. So it's one 30. Yeah. He doesn't have a right. I'm sorry. Asylum unless everybody there says he's just wonderful. I'm sorry. He doesn't have a right to asylum just because people don't think he's wonderful and they disapprove of his views. I've got to find a well-founded fear of persecution. Right. But the thing is, is that you do have these threats that have been, that have been going on over time. Where it gets deadly, the I.J. doesn't believe him. And I need to know why there's not a substantial basis on the record as a whole for the I.J.'s rejection of his credibility. Okay. Well, with regard to the knife, I mean, he, again, the, I don't, the I-589 itself is not contradictory, and that's how I'm defining inconsistent here. It refers to a threat. It is a general statement. It is not a beautifully done I-589. I mean, and the court. Let's see. So what you're saying is if at time one the person says somebody made a threat to me, and at time two he says somebody made a threat to me and put a knife at my throat, there's no contradiction because logically it's possible for one and two to both be true, and therefore there's no substantial basis in the record for rejecting the credibility determination. That's your argument, right? Yes. But the thing, but the thing is, is that the issue is, is that whether or not this I-589, for example, contradicts. I mean, during the testimony he's consistently saying he's talking about the knife. That's what I was just asking. The I-589 in and of itself is not contradictory because it refers to a threat. Again, it's, this is not the first time that the Court has seen a generally written I-589 that refers to something like this, and there is, if the I-589 had said they, you know, there was a threat but there was no knife or anything like that, and then on, and then he, in his testimony, talks about the knife. Well, then there's a contradiction. But this is not that case, and the I-589, I think as this Court has recognized in numerous cases, is, have been problematic. Thank you, counsel. Okay. Thank you. At least the Court, Donald Subion, have responded. Your Honors, there's only one factual incident in this record at issue, and that is this I-5898. The censorship is a backdrop, but that is not at issue. One fact that has not gained a lot of attention is, even if this Petitioner was accosted as he says he was, that is, in the fullness of time he says he was, who did it? He begins his story by saying thus. That's in his police report. The addition of a connection with the government is added for the first time in the asylum application to the service outside of proceedings. And then it's, I feel, or I think, these are people supported or promoted or inspired by the government. And then at hearing, it's the same thing. I just know they're from the government. He was asked, well, did they wear anything that would identify them, like a uniform? He said, well, of course not. Then I'd know who they were. And that's about as good as it gets. I don't mean to demean what may have happened, but the fact is that on this record, we still do not know with any confidence, it's speculation, who these men were. And let's presume that they're just thugs who have some tribal or ethnic or religious or political motivation. They're still private individuals with suspicious motives. And that's all, that's about the best that we can say about it. It comes down then to whoever they are, to a case of threats. With perhaps a suggestion of violence that does not occur. And threats, of course, are not, in almost every case, persecution. For this petitioner to get from here to there, every doubt and every inference has to be for him by not only the fact finder, but by this Court. Everything about his case, with all due respect, suggests that if anything happened, it was just the inspiration for a convenient time to go abroad and seek work under better circumstances. His wife lets the cat out of the bag, so to speak, in her complaint to the police. And the timing of that is itself very suspect. When she tells the police her husband has gone abroad for employment, he comes in, never having suggested to anyone beforehand, connected with any government outside his country, either in London or in this country, that he has this problem. The application comes in at the very last minute after he has overstayed a working visa for a meeting by some 11 months. I won't get into the nature of this meeting that he was coming to attend, but I wish someone at the hearing had explored that so that I could talk about it. But it doesn't sound, frankly, like anything other than some, if I can say so, some excuse for people in problem-plagued third-world countries to get a non-immigrant visa more readily to come to the United States. As Your Honor certainly know from the questions that I've heard this morning from the bench, if the fact-finder can find or has, I should say, one basis related to the basis of the claim or the nature of the claim that he does not believe, and that one doubt is based on substantial evidence, then a petitioner can be found incredible. The fact-finder does not have to disbelieve everything, and he does not have to account or reconcile everything. If it's such a bundle of confusion, the fact-finder can say, here the fact-finder had actually two bases. He did it first on credibility, and then he did it in the alternative for failure of proof. And the petitioner has yet, I submit, to tell anyone why those findings were in error. Thank you, Your Honor. Roberts. Thank you, counsel. The Nura v. Ashcroft is submitted. We are adjourned until I think it's 930 tomorrow morning.
judges: Noonan, Kleinfeld, White